Philip Lantz WELCH, Appellant,

v.

Harriett E. SHELEY, Respondent.

Philip Lantz WELCH, Respondent,

v.

Harriett E. SHELEY, Appellant.

No. 54070.

Supreme Court of Missouri, Division No. 2.

July 14, 1969.

Kenneth E. Arnold, and Edward W. Mullen, Joseph W. Amick, Deacy & Deacy, Kansas City, for defendant-appellant.

Blumer, Wright, Bittiker & Rocha, and Roy F. Carter, Sprinkle, Carter, Larson & Hanna, Kansas City, for plaintiff-respondent, James W. Jeans, Kansas City, of counsel.

HENRY I. EAGER, Special Commissioner.

■ This case involves cross-appeals by plaintiff and defendant in an action for personal injuries and property damage and a counterclaim for personal injuries; it arose out of an automobile collision. The collision occurred at about 6:45 p. m. on Southwest Trafficway in Kansas City on October 17, 1966; it was raining lightly and it was dark, except for numerous street lights and the lights of cars. The jury found for defendant on plaintiff's petition and for plaintiff on defendant's counterclaim. The trial court overruled both motions for new trial and both parties appealed. Plaintiff appealed to this court since the amount he sought was $28,500. Defendant appealed to the Kansas City Court of Appeals because of her $15,000 prayer, but that case was transferred here, and properly so, since plaintiff's appeal vested jurisdiction here. Heuer, et al., v. Ulmer, Mo.App., 264 S.W.2d 895, and cases there cited.

We need not recite the pleadings in any detail. Plaintiff charged defendant with negligence in failing to keep a proper and vigilant lookout ahead, and in negligently operating her car so as to cause or allow it to collide with the rear of a third car and "thereafter bounce" into plaintiff's path. Defendant denied all the substantive allegations and pleaded contributory negligence. Defendant, in her counterclaim, charged plaintiff with negligently failing to keep a careful lookout, with negligent speed, and in failing to stop, slow or swerve. In plaintiff's reply he charged defendant with contributory negligence. Upon motion of the plaintiff, and over the objections of defendant, the court ordered separate trials on the issues of liability and damages as to both claims, with the same jury to determine the damages if that question became material. This procedure seems rather unusual but the defendant has not preserved here any point in opposition to it.

Five cars were involved in this occurrence, directly or indirectly. We shall try to sift out those facts which seem material. The place was, as stated, on the Southwest Trafficway in Kansas City, and within the three southbound lanes. There was a concrete median; construction work was being done on the trafficway further north, but the 3 lanes there were intact. The trafficway sloped gradually upward to the north from this point and downward to the south; it was elevated and 23rd Street passed under it at about the scene of the collision. A ramp entering from the west (and below) is also referred to.

A car driven by a Mr. Sharp went out of control, struck the medial strip and ended up facing the strip and blocking all of the left lane and much of the center lane; a Mr. Steinwart driving behind Sharp in the middle lane saw that occurrence and stopped about 40 feet back; thereupon his car was promptly struck by one driven by a Mr. Trost. We shall refer to these cars and drivers (in certain places) as numbers 1, 2 and 3. Number 2 and number 3 drivers got out, talked briefly and decided to pull their cars over to the medial strip, which they did. No. 2 parked his car along the median, headed south, about 20–40 feet back of the Sharp car; No. 3 parked near the strip and close behind No. 2. Very soon the cars driven by plaintiff and defendant came down the trafficway and two more collisions occurred. Defendant's car (No. 4) was struck in the rear (largely center) by plaintiff's car, and defendant's car also struck, rather violently, the rear of No. 3 (Trost). The big disagreement here is whether defendant first struck Trost's car

in the left lane and "bounced" over in front of plaintiff (as he claims), or whether she had stopped and was knocked into No. 3 by the plaintiff's car. There was much evidence and controversy over which lane the last collision or collisions occurred in and the positions of the cars afterwards.

The plaintiff testified: that he was driving at all pertinent times in the center lane; that defendant was in the left (east) lane and 2–3 car lengths ahead of him; that he was driving at about 35 miles an hour and was not paying any particular attention to defendant's car; that he realized it was ahead of him and in the left lane; that when about 10 car lengths back he saw the Sharp car blocking part of his lane, let up on the gas, and was looking ahead to see if he could swerve to his right, when suddenly the rear end of defendant's car bounced into his lane in an arc, 40 feet or less in front of him; that at impact he had swerved slightly to the right and had gotten his foot on the brake, but he did not know whether the brake had taken effect; that he had no warning and was positive that this collision occurred in the middle lane; that he was not in the left lane at any time; that the left front of his car hit the rear of defendant's, and at that time her car was headed southeast; that after the collision his car was headed slightly east of south, and its left front was just about on the line between the left and middle lanes; that defendant's car was in the middle and west lanes headed generally east, with its rear toward the west wall.

Defendant testified: that she drove entirely in the left (east) lane at approximately 30 miles an hour; that from about two blocks north she saw cars stopped "at the lower end of the grade," including No. 3 with its taillights on; that she decreased her speed, "pumped" her brakes and stopped entirely in the left lane before hitting the No. 3 car (Trost) and about 2 or 3 feet from it; that she was in the middle of the lane and No. 3 was a little closer to the median; that some cars then passed her on the right, and looking in her mirror she saw headlights behind her; that her car was soon struck from behind and knocked into Mr. Trost's car, a "terrific" impact; she estimated the time she was stopped as from 30 seconds to 2 minutes; that her car then "spun" out clockwise into the middle lane and wound up headed northwest across the middle lane and on the "edge" of the right lane; that she was thrown against the top and fell backward over the seat; that plaintiff's car, after the collision, was in the left lane and extending somewhat into the middle lane, headed a little southwest. There is no controversy over the fact that plaintiff's car struck the rear of defendant's car; the question is where, and when and why.

Plaintiff used as a witness the investigating officer, Gerald Greeley. The police report made by him was frequently referred to in much detail but never introduced. He had talked to plaintiff, defendant and others, had made notes at the scene, and had drawn a diagram showing the positions of the cars after he went back to the police station. The diagram was apparently shown to counsel and perhaps to the jury, without objection. He obviously testified from his report and stated: that plaintiff's car was "approximately" in the middle lane headed "slightly southeast"; that defendant's car was located in both the middle and west lanes, leaving just enough room in the west lane for a car to "scrape" by (which one did). Counsel prepared (at the trial) a diagram of the locations, as the witnesses testified, but it has not been sent here. This and the police diagram were apparently in some agreement, but defendant disagreed strongly on certain features concerning 4 and 5. The officer made no measurements; certain errors were shown in his report, such as defendant's address, the exact north and south location on the trafficway, street lights, etc. He insisted throughout that his diagram was correct as to the directions of cars 4 and 5, though possibly a few feet off on exact locations. He talked to all drivers. He testified: that defendant

told him that Mr. Trost stopped suddenly in front of her and that she could not avoid hitting him (which she specifically denied); that when he tried to talk to plaintiff, who was holding a handkerchief to his mouth and bleeding some at the mouth (apparently several teeth were knocked out) the latter told him that he was a lawyer, handed him a professional card, and said that "he did not wish to make a statement at this time." Welch denied this, admitting that he gave the officer a card, but thought his jaw was broken and did not try to talk. More will be said on this point later.

Photographs were identified and offered by both parties; most of them were taken professionally and were used principally to show the damage to the cars. Two were prints of part of a series of television pictures taken soon after the collision. They are rather dim. One was introduced by plaintiff, one by defendant. The parties sought vigorously to use these to show their respective theories as to the locations of the cars after the impact; this was attempted in part by references to street lights and other cars or car lights supposedly shown in the pictures. Both the photos and the testimony were vague. We shall not need to dwell here on any of the photographs.

Mr. Trost (No. 3) testified for defendant, generally, that: No. 1 car spun and hit the medial ahead of him; that the car ahead of him stopped suddenly and he ran into it; that he and the driver that hit him moved their cars over into the left lane and against the median strip, with the other car (No. 2) in front of his. He did not see the impact between plaintiff and defendant. He testified that later plaintiff's car was north of his car, on a slant to the southwest, with its entire rear in the left lane and the left front corner on the line between the left and middle lanes; that defendant's car was somewhat further south in the middle and right lanes and facing southeast.

Points are made in both appeals which arise out of the testimony of J. Wells Steinwart, the driver of the No. 2 car. He testified: that after he had parked his car over against the median strip (as the second in the line of 3) he looked back to the north and, although his view was partially obstructed by the Trost (No. 3) car behind him, he saw the lights of two cars coming down from the north about 100 yards away, one car in the middle lane and one in the east lane; that he did not continue to watch those cars, but that soon thereafter there were two impacts, which he heard rather than saw. He was asked if the cars which he saw to the north were the ones "later on involved in the accident." Specific objections were made on the ground that his testimony would be a mere conclusion, but the objections were overruled at least twice and he answered that, "Yes, those were the cars that were * * *." He further testified that defendant's car stopped by the side of his and facing his, and that plaintiff's car stopped partly in the left lane and partly in the center lane, perhaps more in the center lane, and headed south. On redirect this witness testified that no other cars passed after he saw the lights of two cars prior to the accident. Defendant's counsel moved to strike as a conclusion the testimony that the two cars he saw were the same ones involved in the accident, but after some colloquy the motion was overruled; counsel also moved, at the conclusion of the witness's testimony, for a mistrial on the same ground; this was also overruled with the suggestion that the motion might be renewed at the close of all the evidence. At that time defendant again moved to strike the evidence; the court indicated that the point was of more substance than he originally had thought, but overruled the motion and gave (with other instructions) a withdrawal instruction, No. 10, as follows:

"INSTRUCTION No. 10

"The testimony of Mr. Steinwort that the two vehicles which he saw 100 yeards or more away were the same two vehicles

involved in the collision is withdrawn from the case and you are not to consider such testimony in arriving at your verdict.

MAI 30.01 Submitted by defendant. (GIVEN)"

Plaintiff moved for a directed verdict on the counterclaim and defendant moved for a directed verdict on plaintiff's claim. Both motions were overruled.

On plaintiff's appeal his points are in substance: that the court erred prejudicially in permitting statements and questions on the voir dire concerning the fact that plaintiff's "private plane" was downed on a trip to "one of the South Sea Islands"; that the court erred in giving Instruction No. 10, which did not conform to MAI 30.01; and that it erred in admitting the testimony of the police officer that plaintiff had identified himself as a lawyer and stated that he did not wish to make a statement.

On defendant's appeal the following points are raised: that plaintiff was guilty of contributory negligence as a matter of law; that the court erred in admitting the testimony of witness Steinwart that the two cars which he saw were the ones involved in the accident, in overruling defendant's motions to strike that testimony, in denying its motions for a mistrial, and that the withdrawal instruction did not cure these prejudicial errors; that the court erred in giving a "lookout" instruction (No. 6) submitting defendant's hypothesized negligence because there was no evidence to support it; and, lastly, that the court erred in overruling defendant's various objections to repeated "interruptions, objections and insinuating remarks" by plaintiff's counsel concerning defendant's failure to have a signed statement of witness Greeley marked as an exhibit. In considering these points we shall refer briefly to certain parts of the transcript not already covered.

■ We shall first discuss the plaintiff's appeal, without following the precise order of his points. Initially, however, we conclude that plaintiff was not barred by reason of contributory negligence as a matter of law. The issue was submitted to the jury on an elaborate instruction. On this point it is practically impossible to discuss the numerous cited cases. In most of them it was merely held that there was sufficient evidence of contributory negligence to support an instruction. Miller v. St. L. P. S. Co., Mo., 389 S.W.2d 769; Jackson v. Skelly Oil Co., Mo., 413 S.W.2d 239; Dodson v. Gate City Oil Co., 338 Mo. 183, 88 S.W.2d 866; Haley v. Byers Transp. Co., Mo., 414 S.W.2d 777 (first appeal at 394 S.W.2d 412). In others the facts were materially different from ours. In Dodson, supra, the essential issue on the facts was rather similar to ours. The principles are clear and need not be restated. We may not say here that all reasonable persons would adjudge plaintiff to have been guilty of contributory negligence, and we must consider the evidence from the standpoint most favorable to plaintiff. True, he did not concentrate on watching defendant's car (which was in another lane) but he had not ignored it; he had an immediate hazard confronting him in his own lane and, on his testimony, he was watching primarily to see what he must do about that. A jury could well find him to have been negligent in not slowing more and sooner, or in not swerving earlier, or perhaps in not keeping a better lookout to the left, but these are, in our opinion, fact questions. Upon his testimony defendant's car "bounced" suddenly into his lane without any warning, at a distance of 40 feet or less. The collision of plaintiff and defendant occurred considerably north of the No. 1 car (Sharp) and also north of cars 2 and 3. A jury should decide whether plaintiff sufficiently concerned himself with the objects and events in the east lane and took the necessary action. This point is denied. Plaintiff does not contend that there was insufficient evidence for a factual submission of contributory negligence.

Before the trial began counsel for plaintiff and defendant appeared in the court's

chambers and stated that plaintiff had been caused to land his private plane in the Atlantic Ocean (or it had crashed) while on a trip in November 1967; that there had been considerable publicity about the matter both on radio, in newspapers and on television, apparently while waiting for him and his companion to be found and rescued. Plaintiff's counsel insisted that, if used at all on the voir dire, the matter would be extremely prejudicial as showing that plaintiff was wealthy enough to own and fly a private plane. Defendant's counsel urged that on account of the publicity he was entitled to inquire of the panel whether anyone would be affected by the incident and that some jurors might be affected in plaintiff's favor by the unfortunate incident. The court ruled that *"for mere identification"* reference might be made to the fact that plaintiff had been so publicized but that the details would not be discussed. We are not certain that we now understand the court's reference to "identification," unless to show that it was this plaintiff who had the mishap. Incidentally, a lawyer associated for plaintiff in the trial was in the plane with him at the time. On the extensive voir dire the following occurred: (By defendant's counsel)—"Now, some three or four months ago there was, oh, an article, two or three articles in the newspaper, an item or two on television, and two or three news items on the radio about the fact that Mr. Welch and Mr. Horn of that law firm were flying in Mr. Welch's private plane down to one of the South Sea Islands and he dropped his airplane in the Atlantic Ocean. I think it was a fishing boat or somebody fished them out.

"Is there anyone on the panel who has any recollection of that matter such that it would cause you to have any feeling or leaning one way or the other in this case? That incident or accident that he had at that time cause you to feel *sympathic* with the guy for having dropped his airplane in the ocean, or in any manner affect your ability to determine this case strictly on its own two feet without reference to that publicity?"

There was no response from any juryman. Counsel later made a similar but somewhat briefer statement of the matter to 6 additional prospective jurors (one of whom was chosen), but corrected his geography to show that plaintiff was headed to "some place south of Florida," and also referred to the loss of his (plaintiff's) plane. One of the latter jurors had heard of the incident but stated that it would not affect him, and apparently he did not serve on the trial jury. Plaintiff's counsel had made his objections in detail and of record on this matter in chambers; and during the original voir dire at the close of the general questions plaintiff again objected and moved for a mistrial.

■ It seems perfectly obvious that the most probable effect of this incident would be to create in the mind of the jurors the impression that the plaintiff was a person of considerable means, if he could fly overseas in his own private plane. The idea that the incident would create sympathy *for him* seems most illusory. We are impelled to find that counsel knowingly used this incident to create prejudice against plaintiff, and that the court, for some reason unsubstantial to us, permitted it. We hold that this action constituted prejudicial error. The situation was made worse because of the fact that plaintiff was a comparatively young lawyer, in active practice and involved chiefly in personal injury cases, whereas the defendant was a single woman, 72 years of age at trial, and employed in a realty office. The incident was made more meaningful by subsequent statements in defendant's closing argument to the effect that Mr. Welch was "the bright, young lawyer" who refused to give a statement until he found out "everybody else's version," that plaintiff had had a very prompt investigation made through other lawyers, that he was a "highly skilled, highly trained courtroom performer," and that plaintiff had come in "with a finely built, well constructed case * * *." No error is or was specifically assigned to those references, nor were objections made, but they

tended, very naturally, to intensify the effect of the original error on voir dire. No cases are cited, pro or con, upon a similar situation, although some are cited on the general principles applicable. We may merely note that in such cases as Critcher v. Rudy Fick, Inc., Mo., 315 S.W.2d 421, Dunn v. Term. R. R. Ass'n, Mo., 285 S.W.2d 701, and O'Hara v. Lamb Construction Co., Mo.App., 197 S.W. 163, it is held to be highly improper for counsel to disclose to a jury extrinsic matters which, to their knowledge, will tend to create prejudice against the other party; and it is immaterial whether this is done on voir dire, in evidence, or in argument. See also 88 C.J.S. Trial § 159, p. 308. The cases cited by defendant to show a broad discretion in the trial court on voir dire are inapplicable here. Counsel for defendant say that plaintiff has not asserted in his brief an abuse of discretion. All of plaintiff's argument on the subject is directed to a wrong action of the trial court, whatever it be called, and we hold that there was an abuse of discretion. The judgment for defendant on plaintiff's claim and petition is reversed for the reason stated.

In the light of the above ruling it is not necessary to decide plaintiff's other points. They concern the *form* of the withdrawal instruction (No. 10), and the admission in evidence of certain parts of the testimony of the investigating officer. In the event of a retrial it may be that neither point will again be reached, and we shall not render, on these, an advisory opinion.

■■ We now consider defendant's appeal from the adverse verdict on her counterclaim. The first point is that the court's withdrawal instruction did not cure the prejudice caused in admitting Mr. Steinwart's conclusion that the car lights he saw coming down the grade were those of the same two cars which soon collided; and that defendant's objections, motions to strike and motions for a mistrial should have been sustained. Legally, the giving of the withdrawal instruction was of the same

nature as a statement that the evidence was stricken, made at the close of all the evidence. It was in effect a written sustention of such a motion. The instruction was most clearly directed to this particular testimony. In view of the fact that Steinwart testified positively on redirect examination that *no other cars* passed between the time he saw the lights and the following collisions, we are a little surprised that plaintiff now concedes (apparently) that the evidence was inadmissible; however, he makes no such point on his appeal and we shall not go into that question. Defendant cites several cases to demonstrate, by rather dim analogy, that this evidence was a conclusion, or a guess, and of no probative value. We shall not discuss them, since there now is no issue thereon in view of plaintiff's position as just stated. The remaining question is whether Instruction No. 10 sufficiently corrected the supposed error. The evidence was not essential to the submission of plaintiff's case. It was material to the jury's consideration. The cited cases in which new trials were granted for the erroneous admission of evidence (despite other action of the trial court) involved much more inflammatory types of testimony, as for instance: that the defendant was not honest (City of Gallatin ex rel. Dixon v. Murphy, Mo.App., 217 S.W.2d 400); indirect testimony of the result of a blood test in a driving while intoxicated (manslaughter) case although the results of the test had previously been suppressed on motion (State v. Burchett, Mo., 302 S.W.2d 9); and testimony of an implied admission of liability (Spears v. Schantz, 241 Mo. App. 879, 246 S.W.2d 399). The principle that evidence improperly admitted is presumed to be prejudicial (Holmes v. Terminal R. R. Ass'n, 363 Mo. 1178, 257 S.W.2d 922) is not determinative here, because the court recognized that fact in giving the withdrawal instruction. On this whole record we conclude that the testimony was not of such an inflammatory or highly prejudicial nature that its effect could not legally be eradicated by the withdrawal instruction; the instruction was given in the *form*

submitted by defendant. In this discussion we have assumed that the evidence was improper, but, as stated, we do not decide that question on the present record. The point is denied.

Defendant's next point is that there was no evidence to support plaintiff's contributory negligence "lookout" instruction (No. 6) offered and given against defendant on her counterclaim. It was as follows:

"INSTRUCTION NO. 6

"Your verdict must be for plaintiff on defendant's counterclaim for damages whether or not plaintiff was negligent if you believe:

First, defendant failed to keep a careful lookout, and

Second, defendant was thereby negligent, and

Third, such negligence of defendant directly caused or directly contributed to cause any damage defendant may have sustained.

Submitted by Plaintiff MAI 28.01 and 17.01 (GIVEN)"

 Defendant urges that the only evidence "as to whether or not defendant kept a careful lookout was defendant's own testimony." That may be true if we deal only with specific and affirmative evidence, but such is not the test. Plaintiff is entitled to an instruction upon the theory of his own evidence, and we must consider the evidence in the light most favorable to him. Miller v. Riss & Co., Mo., 259 S.W.2d 366; Bashkow v. McBride, Mo.App., 177 S.W.2d 637; See v. Kelly, Mo.App., 363 S.W.2d 213. The following cases are illustrative of our opinions holding that a lookout submission is proper where the evidence justifies an inference of failure to keep a careful lookout from the facts and circumstances, when considered in the light most favorable to the party offering the instruction. Butcher v. Main, Mo., 426 S.W.2d 356; Moore v. Ready Mixed Concrete Co., Mo., 329

S.W.2d 14; Miller v. St. L. P. S. Co., Mo., 389 S.W.2d 769; Kitchen v. Wilson, Mo., 335 S.W.2d 38; Whaley v. Zervas, Mo., 367 S.W.2d 611; Patton v. Hanson, Mo., 286 S.W.2d 829; Creech v. Riss & Co., Mo., 285 S.W.2d 554; See v. Kelly, Mo.App., 363 S.W.2d 213. Seldom would a party have affirmative evidence that the opposing party was *not* keeping a proper lookout. In Dawley v. Hoy, Mo., 341 S.W.2d 111, relied on by defendant, the two questioned instructions were apparently held erroneous primarily because they did not properly hypothesize the facts on defendant's theory or submit the issues clearly, and that they were confusing and misleading. The court did say, l. c. 117, that "There was no evidence that plaintiff did not keep a lookout * * *," but if this be considered as a statement that there must be direct evidence on the subject (which, in the full context we do not believe is true), then the opinion is out of harmony with the great weight of authority in Missouri. That case was decided before MAI. Certain of the cases cited by defendant recognize the controlling effect of evidence which permits reasonable inferences from the facts and circumstances. Reed v. Burks, Mo.App., 393 S.W.2d 377; Williams v. Boone, Mo. App., 413 S.W.2d 36; Hawkeye-Security Ins. Co. v. Thomas, etc., Mo.App., 407 S.W.2d 622; and in some the evidence on causation was insufficient, as in Reed, supra. In none were there such facts as we have here. Generally speaking the issue is submissible if there is evidence that the party charged with negligence could have seen the other car (or object) sooner and in time to have acted to avoid the occurrence. Hawkeye, supra. The jury has the right to disbelieve entirely the evidence of a party that he *was* looking vigilantly, or even his testimony that he saw the other car at a certain distance, or that he had stopped. A good enunciation of the lookout doctrine appears in Miller v. St. L. P. S. Co., supra.

In this case the left lane up to the car of Mr. Trost (No. 3) was unobstructed, and the vision for a block or two was clear; all

agree that defendant was driving in the left lane, and the evidence is almost conclusive that she could have seen the 3 cars in time to stop. She says she *did;* plaintiff says she *did not.* If we accept plaintiff's testimony here there is certainly an inference that defendant did initially run into the rear of Trost's car and bounce suddenly over into the middle lane, and that she did so either negligently or intentionally. No one can really believe the latter. On the evidence, therefore, a fair inference arises that she did not watch ahead with sufficient diligence to permit timely action. That conclusion is also supported, so far as submissibility is concerned, by the officer's testimony that defendant told him that "the No. 3 vehicle (Trost) stopped suddenly in front of her and she could not avoid impact." The plaintiff was in nowise bound by her testimony. We hold that there was sufficient evidence here to support the instruction in that the jury might reasonably infer that defendant did strike the Trost car before her collision with plaintiff, that she then "bounced" out into the middle lane, and that her first collision was proximately caused by her failure to see Trost's car in time to take effective action.

■ Defendant's last point is that the court erred in overruling her various objections to remarks, interruptions and "insinuations" of plaintiff's counsel while defendant's counsel was cross-examining Officer Greeley. The witness had previously testified to the positions of the cars after the collision and it was developed that he had given a written statement to an associate (Mr. Amick) of trial defense counsel a week or so before the trial. Counsel for defendant sought to show by his questions that the witness had then *told* Mr. Amick certain things (presumably contrary to his original report and diagram), whereupon counsel for plaintiff objected on the ground that this was not the proper method of cross-examination from a written statement, insisting that the statement should be "marked" as an exhibit. It is defendant's position that the written statement did not need to be identified or offered unless the witness denied making that part which was being put in question, and counsel for defendant says that he was accused of "attempting to do something wrong" in not offering the statement. The question was finally asked in a form quoted from the written statement and it was answered, and the net result was that the witness had told Amick that the cars might have been "positioned differently" than shown on his diagram "as to where they were sitting, not what position they were pointing." Finally counsel for defendant voluntarily let plaintiff's counsel see the written statement. Two or three objections made by defendant were overruled, but it would seem that defendant succeeded in getting into evidence the answer that he was seeking. We see no such insinuations of improper conduct as would create any substantial prejudice, and the whole matter was more or less a "tempest in a teapot." We have considered the cases cited and they are not persuasive in this situation. Even if the trial court was wrong, its rulings constituted no substantial prejudice. The court also overruled plaintiff's counsel in his attempts to have the written statement identified. The point is denied.

Defendant moved to dismiss plaintiff's appeal and the motion was ordered taken with the case. It is now overruled. The judgment in favor of defendant on plaintiff's petition and claim is reversed, and that part of the cause is remanded for retrial. The judgment in favor of plaintiff on defendant's counterclaim is affirmed, but that judgment should be held in abeyance until the disposition of the whole case. It is so ordered.

PER CURIAM:

The foregoing opinion by HENRY I. EAGER, Special Commissioner, is adopted as the opinion of the Court.

All of the Judges concur.