Mary JINES and Joe Jines,
Plaintiffs-Respondents,

v.

William C. YOUNG, M.D.,
Defendant-Appellant.

No. 14618.

Missouri Court of Appeals,
Southern District,
Division Two.

July 1, 1987.

Manuel Drumm, Drumm & Winchester, Sikeston, for defendant-appellant.

C.H. Parsons, Jr., Dennis P. Wilson, Parsons, Mitchell & Wilson, Dexter, James R. Robison, Sikeston, for plaintiffs-respondents.

HOGAN, Judge.

Mary Jines and her husband, Joe Jines, instituted this action against defendant William C. Young, a practicing physician, alleging medical malpractice. The plaintiffs sought money damages for negligent treatment of a fracture. The injury complained of, allegedly caused by the defendant's negligence, was effective loss of use of plaintiff Mary Jines' left arm. Mary is left oriented, or "left-handed." Plaintiffs have had a verdict in the aggregate amount of $375,000. The defendant now appeals. Four assignments of error have been briefed. The defendant contends: (1) that the answers to hypothetical questions addressed by plaintiff to her expert witnesses Conrad and Rehm were erroneously received because those questions did not fairly hypothesize the facts material and relevant to the issue of causation; (2) that the trial court erred in failing to grant defendant's motion for a directed verdict or motion for judgment notwithstanding the verdict because the plaintiffs failed to establish a direct causal connection between the defendant's negligence and the plaintiff's injury; (3) that Instructions No. 8 and 12 erroneously hypothesized the element of causation; (4) that the verdict-directors given—Instructions No. 8 and 12—failed to hypothesize a fact essential to defendant's liability.

A synoptic review of the evidence is required. Plaintiff Mary Jines fell at her home on February 3, 1979, and broke her arm. Mary sustained a fracture which is called a "Monteggia's fracture." This injury is a fracture of the ulna, which is the bone on the little finger side of the forearm. If the ulna is displaced, the result is a dislocation or fracture of the radius, which is the bone on the thumb side of the forearm. The defendant described this fracture as "a fracture which is, probably has more difficulties and general failure than any other injury to the skeletal system."

On Sunday, February 4, the defendant performed an open reduction of the fracture by affixing a compression plate.[1] The defendant also reduced the head of the radius, which was dislocated. He applied a long-arm cast to Mary's arm. She was discharged on Wednesday, at which time she was given a 5–day prescription for Keflex, an antibiotic. On February 13, Mary had her first postoperative visit. X-rays of her arm were taken; the fracture appeared to be in good alignment. There was no indication of any infection. Mary was told to return in about 1 month.

About a week after the February 13 visit, Mary developed a burning sensation and a good deal of pain in her arm. She noticed a foul odor coming from her cast and a spot appeared on the outside of the cast. On March 1, Mary returned to see the defendant because of these disturbing symptoms. The defendant removed the cast and observed a foul odor and a pussy discharge coming from the suture site on Mary's left arm. The defendant probed the area, but did not find the infection confined to one area. He removed the sutures and applied a new long-arm cast. In a pretrial deposition, defendant stated he knew his patient had an infection on March 1. The defendant gave Mary a 10–day prescription for Keflex and made another appointment for March 20. According to Mary, her arm was red "and it was pus everywhere" but the defendant assured her "[d]on't be concerned about it, it'll be all right."

Mary's arm did not improve at that time; it got worse. She continued to have pain, drainage of pus, and emission of a foul odor from the cast. On March 15, Mary returned to see the defendant before her scheduled appointment. When the defendant "windowed" Mary's cast, he found that the "sheet wadding" or material directly under the cast was saturated with pus. The defendant removed the cast. The defendant's notes at this point state that the old infected site was healing, but that upon probing further down the arm, he found more pus. Defendant applied a new long-arm cast, not windowed, and told Mary to return in 2 weeks. Mary testified that the defendant again told her the infection was nothing to be concerned about. Her arm continued to get worse.

On March 20, Mary returned to see the defendant. Defendant found Mary's arm was still infected and draining. Again the sheet wadding was saturated with pus. The defendant "windowed" Mary's cast and probed two small openings, one of which was deep to the compression plate. A bacterial culture taken on March 15 had indicated the presence of bacteria known as "staphylococcus epidermidis" and the defendant gave Mary erythromycin, another antibiotic, because he believed her body might be building up a resistance to Keflex. He left a window in the cast and instructed Mary and her husband how to change bandages over the wound. Mary was told to return in 1 week and was reassured.

On March 27, the defendant's progress notes state: "[p]atient is much better today. One small area at the proximal portion of the incision was ... probed.... The hemostat does go down to the [compression] plate. There [w]as a minimal amount of drainage today, however, patient states that she has had a large amount of drainage and it is necessary to change the dressing three times a day." Mary was to continue her antibiotics and return on April 6.

On April 5, Mary went again to see the defendant and he probed a small area in the incision. It seemed to the defendant the surgical wound was healing from the bottom. Mary said there had been less drainage for 1 or 2 days following the March 27 visit, but thereafter there was a copious amount of drainage. Mary was told to return in 2 weeks or sooner if necessary.

On April 19, Mary returned to see the defendant. She stated there was somewhat less drainage. She was still on antibi-

---

**1.** This "compression plate" was a stainless steel plate approximately four inches long and one-half inch wide, held in place by four or five screws made of stainless steel. This plate holds the ends of the fractured bone in place while the break heals.

otics. The area of infection was cauterized with silver nitrate. An x-ray—the first taken since February 13—showed that two of the screws in the compression plate were beginning to pull out. The progress note states:

"This is highly suggestive of infection in the bone.... We will plan to bring patient in the hospital, take to operating room, open the area, and insert a catherer [sic] for continous [sic] antibiotic irrigation for 1 week.... If, however, the fracture site is unstable at the time of surgery, we will remove the plate and infected bone and later plan a bone graft. The details of this were explained to the patient and she fully understands...."

Mary was extremely disturbed by the information that further surgery would be necessary and she decided to consult Dr. Ralph Rehm, her family physician, about her medical problems. On April 20, she saw Dr. Rehm, who concluded she had a serious infection. Dr. Rehm believed that Mary had probably developed osteomyelitis, a bone infection, and decided to refer her to a group of orthopedic specialists in Memphis known as the Campbell Clinic.

Mary did go to the Campbell Clinic, where she was seen and evaluated by Dr. Robert E. Tooms, a member of the orthopedic group. On May 11, 1979, Dr. Tooms wrote to Dr. Rehm, stating in pertinent part:

"I believe Mrs. Jines has an infected fracture in the proximal ulna. In my opinion, the appropriate treatment for her at this point would be to remove the plate and screws together with any infected material at the fracture site and continue her on a systemic antibiotic program. I do not believe any definitive treatment for the fracture should be attempted until she has been completely healed and clear of all drainage for a minimum period of six months. This opinion was communicated to Mrs. Jines. She will consider whether or not she wishes to pursue treatment for this in Poplar Bluff or should she elect to continue the treatment here, I certainly will be pleased to see her."

Mary did elect to continue her treatment at the Campbell Clinic, rather than at Poplar Bluff. Dr. Thomas David Sisk, an orthopedic surgeon who practices at the Campbell Clinic, undertook to treat Mary's arm. Mary was admitted to the Baptist Memorial Hospital on May 27, 1979. Under general anesthesia, an incision was made in line with the old incision, and a sinus was excised. The compression plate was exposed, found to be loose, and was removed. Granulation tissue in the area of the old fracture was removed. The surgical wound was irrigated but left open. Dr. Sisk testified that the wound was left open to "allow dressings, [and to] allow ... any accumulating blood or pus to be readily removed from the wound." Apparently, Mary's arm was placed in a cast. She was given an antibiotic called Keflin, and was later switched to a tablet form of the same drug called Keflex. The medical records introduced in evidence indicate that she progressed fairly well from April 1979 to January 9, 1980, but without any healing of the original fracture. On January 9, 1980, the progress note reads as follows:

"Patient returns today. X-ray shows her nonunion of her proximal ulnar [sic] with a dislocation of her radial head. She has had no sign of infection now for over six months and desires to have an open reduction internal fixation with bone grafting. We will probably have to remove the radial head. Arrangements are made for this in the next few days."

On January 14, 1980, Dr. Sisk again operated on Mary at the Baptist Memorial Hospital. Dr. Sisk's shorthand description of his procedure was that "We again opened a large extent of her upper arm through the previous incision, or the previous scar, and exposed the bone, put the bone back together with a metal plate and screws, and put a bone graft in the site that had not healed, to bridge the gap." The bone graft was taken from Mary's pelvic bone.

Mary continued to return to the Campbell Clinic at various times from January 20, 1980, when she was discharged from the Baptist Hospital, to July 1981, and during this period she appeared to be making

some minimal progress. Early in July, according to Dr. Sisk, Mary was "having trouble with the [compression] plate immediately under the skin. The radial head was popping when she attempted to rotate her arm, and we felt sufficient time had passed that we were certain that there was no infection present and that her fracture had healed and it was safe then to proceed with surgery." On the 9th of July 1981, the compression plate which Dr. Sisk had affixed was removed and the radial head was resected or removed.[2] By July 16, the progress notes indicated "some off set at the proximal end of the [bone] graft." By August 4, it was apparent to Dr. Sisk that there was a "complete displacement" of the graft and there was "... no other alternative other than to again plate and bone graft this [fracture]."

Mary was again admitted to the Baptist Hospital, and on August 13, 1981, in Dr. Sisk's words "... we opened the previous incision and applied another bone plate and screws, and put some additional bone graft about the place that had not healed." This operation differed from Dr. Sisk's first operation in that the first operation "involved inserting an approximate inch long plug or piece of bone between the gaps within the bone. There was no gap in the bone [on August 13th]. It was simply a matter of joining, putting the bone ends together and then putting bone chips or bone crumbs around the [edge] of this in an effort to hopefully stimulate the healing process."

Mary was seen by Dr. Sisk at the end of August. Her surgical incision had healed and there was no sign of any infection. A fresh cast was applied. In September, Mary seemed to be progressing as Dr. Sisk had expected. Her cast was removed and she was given a split cast which she could remove at night. Nevertheless in October, Mary again developed redness and drainage in her skin incision. She was again hospitalized and given antibiotics. Mary was discharged after a short stay in the hospital. In November, Mary still had a "small spot of drainage from time to time"

but Dr. Sisk "saw no threatening infection." X-rays of the plate and the bone graft disclosed nothing unsatisfactory.

On February 12, 1982, approximately 3 years after the original injury, Dr. Sisk's progress note reads:

"Patient comes in today and is doing fairly well. She is still draining from three small sinuses. She has no surrounding cellulitis. X-ray shows apparently further union of her nonunion site. I have indicated to her that I believe we should place her back on some antibiotics, Keflex, 500 milligrams, to be taken three times a day for the next ten days or so."

Whatever progress Mary made as a result of the second graft operation was short-lived. Dr. Sisk's note of March 26, 1982, reads:

"Mary comes in today and continues to drain from her forearm. Several of the screw heads are apparent. X-rays show apparent loosening of the two center screws. It is difficult to tell whether union is complete or not. I have cleansed this and have indicated to her that we are probably near the time when it will be necessary to remove her plate and screws."

On April 15, Dr. Sisk again operated on Mary at the Baptist Hospital in Memphis. Under general anesthesia, Dr. Sisk incised the entire length of the old compression plate connecting two sites of drainage from the surgical wound. The skin edges were resected and some necrotic tissue was removed. The drill holes left by the plate screws were scraped with a curette. The surgical wound made at this time was packed open. A sterile dressing and a plaster splint were applied.

On April 23, 1982, Mary was seen by one of Dr. Sisk's associates, Dr. Alvin Ingram. Dr. Ingram's note of that date states:

"I saw Mrs. Jines in consultation with Dr. Sisk today. She has a *refracture* of the ulna at the distal end of her [bone]

2. The "head" of the radius is that part of the bone on the thumb side of the forearm which articulates with the upper arm at the elbow.

*See* Grant's Atlas of Anatomy diagram 6–50 (8th ed. 1983).

graft. I agree that we should apply the electromagnetic coils...." (Our emphasis.)

Dr. Sisk explained that he considered using the electromagnetic coils because Mary's fracture had failed to heal after two bone grafting procedures "and in the presence of an infection." The electromagnetic coils and other treatment were tried at the Campbell Clinic from May 1982 to April 1983, but Mary made little or no progress. During that period, Mary continuously took pain medication.

For whatever reason, in April of 1983, Mary consulted Dr. Raymond A. Ritter, an orthopedic surgeon with offices at Cape Girardeau. His report was not cheerful, and need not be synopsized here. Mary was referred then to Dr. Robert William Gaines, an orthopedic surgeon who practices at the University of Missouri Health Science Center at Columbia, Missouri.

Dr. Gaines found that Mary had several problems. He put his initial impression thus: "First of all, she had chronic osteomyelitis of her ulna. She had a very unstable forearm, she had a painful and unstable elbow joint, and she had a non-union of her ulna." Dr. Gaines demonstrated the function of the bones in the forearm, the operation of the elbow joint and the mechanisms of pronation and supination of the hand with models. Unfortunately, we cannot reproduce this demonstration in this opinion.

Dr. Gaines found that Mary still had drainage coming out of the ulna, and that there was a "bony gap" in the center part of her ulna and infected bone for about 2 inches on either side of that gap. It was apparent to Dr. Gaines that numerous attempts had been made to try to bridge that gap and that the attempts had been unsuccessful. In his opinion, Mary had had all the treatment that should have produced union across the gap. So, Dr. Gaines believed the first important thing to do was to eradicate the infection. Dr. Gaines removed all the infected bone, which meant that Mary no longer had a 5 or 6 inch segment of her left ulna. Dr. Gaines left approximately 2 inches of the ulna at the upper end, toward the elbow, and 2 inches toward the wrist. He removed all the bone that showed evidence of active infection. Dr. Gaines hoped that he would be able to perform a radical operation in the future, but could not be sure at the time his deposition was given.

The extent of Mary's disability just before trial was noted and described by Dr. Rehm, her family physician. We quote his testimony:

"Examination revealed a badly deformed left forearm, shortened approximately one and a half inches in length. The radius or the bone on the thumb side of the arm was dislocated at the proximal or elbow end, with that end of the radius over in the area where the ulna is normally. She had marked limitation of motion of the elbow being able to flex the elbow to ninety degrees or square. She could extend the elbow to approximately fifteen degrees from being totally straight. She was extremely weak in that arm, being able to move the fingers but being able to lift only very light objects, less than one pound, and that only off the table."

Other facts will be noted in the course of the opinion.

## I

### Sufficiency of the Evidence of Causation

The first assignment of error to be addressed is the defendant's contention that the plaintiffs failed to establish a direct causal connection between the defendant's negligence and the plaintiff's injury. The basic principles by which we are guided are clear and straightforward. Our courts have in recent years held that to make a prima facie case of medical malpractice, a plaintiff must establish three elements: (1) that an act or omission of the defendant failed to meet the requisite medical standard of care; (2) that the act or omission was performed negligently, and (3) that there was a causal connection between the act or omission and the plaintiff's injury. *Wilson v. Lockwood*, 711 S.W.2d 545, 550 (Mo.App.1986); *Yoos v. Jewish Hospital of St. Louis*, 645 S.W.2d

177, 183[1, 2] (Mo.App.1982). But while the plaintiff has the burden to prove causation as well as the other elements of his case, causation need not be directly proved. The burden of proof may be met by circumstantial evidence. *Hasemeier v. Smith,* 361 S.W.2d 697, 702[6] (Mo.banc 1962); *Kappel v. Slickman,* 401 S.W.2d 451, 453[1] (Mo.1966). Generally, plaintiff makes a submissible case on the question of causation if he presents substantial evidence that his injury is a natural and probable consequence of the defendant's act or omission. If the logical conclusion from the evidence is that if certain things had been properly done certain results would not have occurred, and such results *did* occur, the evidence of causation is sufficient. *Steele v. Woods,* 327 S.W.2d 187, 195 (Mo.1959); *Delisi v. St. Luke's Episcopal-Presbyterian Hospital,* 701 S.W.2d 170, 175[10–13] (Mo.App.1985).

The hypothesis or theory of plaintiffs' experts, generally stated, was that if Mary's initial infection had been more aggressively treated, her osteomyelitis, or bone infection, would not have developed. Plaintiffs had the evidence of two physicians on the question of causation. The first was Dr. Ralph Rehm, a physician who practiced in Stoddard County, and was Mary's family physician. In response to a hypothetical question concerning the defendant's treatment of the plaintiff when the wound infection became apparent on March 1, 1979, Dr. Rehm was asked whether, in his opinion, defendant "used that degree of skill and learning ordinarily used by members of the medical profession under the same or similar circumstances...." We quote a part of his answer:

"A. In my opinion he did not exercise the care normally required.

Q. Doctor, in your opinion what would a member of the medical profession, using that degree of skill and learning ordinarily used by members of their profession, have done on March 1, 1979, under the circumstances which I asked you to assume?

A. Number one is to diagnose a wound infection of the surgical site.

Q. All right, sir.

A. Number two, a culture and sensitivity of the pus should have been run. A culture is where you grow out the germ and identify it if there is a germ there. And the sensitivity is tests that they run to find out which antibiotics that particular germ is sensitive to. So, the infection; the culture and sensitivity; open and drain and clean the wound; x-ray her arm to see if there was any signs of infection in and around the bone or loosening of the screws as an infection would cause. The next thing would be to hospitalize the patient and care for her in the hospital on a very frequent basis because this can lead to a severe infection. The next thing is to start intravenous antibiotics intravenously according to the sensitivity that was, that was shown on the culture and sensitivity."

Dr. Rehm was asked if his study of Mary's medical records indicated there was any infection "in and around" the bone on March 1, 1979. He answered that there was none. This physician was then asked if he had an opinion, based upon the hypothetical question put to him, whether the surgical wound which Mary had contracted by March 1, 1979, would have been cured if she had been given the more intensive treatment he described. The witness replied:

"A. ... I would of [sic] been reasonably sure that she would have been cured.

Q. And, in your opinion, had those steps been taken, basing your opinion on a reasonable degree of medical certainty, would we have been confronted with a bone infection?

A. No."

Dr. Rehm was further asked:

"Q. Now, do you have an opinion, Doctor, based upon a reasonable degree of medical certainty, whether that treatment would have been

necessary, the treatment at Memphis and at the University of Missouri, if the wound infection had been treated on March 1, 1979, in the manner which you have described?

A. Yes, I do.

Q. What is that opinion?

A. That is that the further treatment would not have been required."

The defendant calls our attention to Dr. Rehm's statement on cross-examination that the defendant did not do anything to cause the plaintiff's osteomyelitis, contending that this statement is contradictory to the opinion the doctor expressed on direct examination. This argument may be answered by saying that when a witness' testimony is not inherently self-contradictory, his testimony must be considered as an integrated whole. *Yoos v. Jewish Hospital of St. Louis,* 645 S.W.2d at 185[7, 8]; *Odum v. Cejas,* 510 S.W.2d 218, 223[4] (Mo.App.1974). Considered as a whole, Dr. Rehm's testimony provided substantial evidence of causation.

Evidence of causation is also found in the testimony of Dr. Marshall B. Conrad, a physician who had been practicing orthopedic surgery in St. Louis since 1954. At the time he testified by deposition, Dr. Conrad had considerably reduced his clinical practice but was a member of the faculty of the Washington University School of Medicine, where he was an Associate Professor of Clinical Orthopedic Surgery. Having studied Mary's medical records and having examined her at the request of her counsel, Dr. Conrad was asked a long hypothetical question and was further asked if, based on the hypothesis stated, the defendant used that degree of skill and learning ordinarily used by members of the medical profession under the same or similar circumstances. Dr. Conrad's opinion was that the defendant did not. Dr. Conrad was asked to state what the proper course of treatment would have been on March 1, 1979. We quote parts of Dr. Conrad's testimony:

"A. Based ... on the hypothetical that you've just gone over, ... there was obvious evidence of a wound infection. I would agree with the removal of sutures. But given the other circumstances, he, he should have gone much further than that and specifically should have cultured the drainage at that time.

Q. Doctor, what do you mean by cultured the drainage, sir?

A. Take a specimen of the purulent drainage and sent it to a laboratory for culture, which would identify the infecting agent, the bacteria, whatever it was that was causing the infection. This could then be tested for antibiotic sensitivity so that the appropriate antibiotics, antibiotic or antibiotics could have been prescribed.

Furthermore, I think that again, given the facts that you have described, at that point she should have been readmitted to the hospital for more aggressive treatment.

Q. What do you mean by aggressive treatment?

A. Well, once the, once the infecting organism was identified and the sensitivities, sensitivity studies done, *this is a grave situation obviously clinically based on the clinical description, she's got a wound infection. A wound infection in a surgical wound which has been used to do, to treat a fracture, is a bad complication.*

At that point, the proper course of treatment from an orthopedic standpoint would have been to put her in the hospital, get the appropriate culture and sensitivity studies, remove all the sutures, open the wound up sufficiently that you could establish adequate drainage, and then treat her with large doses of the appropriate antibiotic or antibiotics, including intravenously, which would really be the best way to do it.

What I'm saying is, that this is a complication ، that occurs following a surgical treatment of fractures. *It's a bad complication, and the only prospect of controlling the situation and salvaging the best possible result is*

*aggressive treatment of the infection.*" (Our Emphasis.)

Dr. Conrad was asked if Mary's course of recovery would have been different if she had received more aggressive treatment of the initial infection. He answered:

"A. ... Given this situation, no matter under ideal circumstances, sometimes a bad result is obtained. *But failing to do what I've described almost insures that there is gong [sic] to be a bad result."* (Our emphasis.)

To reiterate the controlling principle, as stated in *Steele v. Woods,* 327 S.W.2d at 195, and *Delisi v. St. Luke's Episcopal-Presbyterian Hospital,* 701 S.W.2d at 175, if the logical conclusion from the evidence is that if certain things were properly done certain results would not have occurred, and such results *did* occur, the question of causation should be submitted. The evidence we have recited meets the criterion stated, and we find the evidence of causation sufficient.

## II

### Sufficiency of Facts Included in Hypothetical Questions

Another assignment of error deals with the hypothetical questions put to Dr. Rehm and Dr. Conrad on the issues of the defendant's negligence and causation. Specifically, the defendant contends that the hypothetical questions did not fairly hypothesize or present the material facts.

### A

■ We have been over a good deal of the testimony given by Dr. Conrad. His deposition testimony was presented to the jury by videotape. The defendant made no objection to the hypothetical question put to Dr. Conrad concerning the defendant's negligence vel non during the taking of the videotape deposition, nor did he object when the videotape was played for the jury. This particular complaint has not been properly preserved for review. *Duke v. Gulf & Western Mfg. Co.,* 660 S.W.2d 404, 409, n. 1 (Mo.App.1983); *Byrd v. Brown,* 641 S.W.2d 163, 175[11, 12] (Mo.

App.1982); *Chambers v. Bunker,* 598 S.W.2d 204, 206[1] (Mo.App.1980); *Perkins v. Kroger Co.,* 592 S.W.2d 292, 294–95[1–4] (Mo.App.1979).

■ Dr. Rehm was asked the same hypothetical question concerning defendant's negligence as had been put to Dr. Conrad. The defendant objected, asserting that the hypothesis did not: (1) include a bacterial culture made by the defendant on March 15, 1979, nor (2) include the entire course of Mary's treatment after March 1, 1979. This objection has been preserved for review but we find it to be without merit. A hypothetical question need not include all material facts supported by the evidence; it must include facts sufficient to present the questioner's theory of the case. *Everett v. Bishop,* 680 S.W.2d 779, 780[1, 2] (Mo.App.1984); *Grindstaff v. Tygett,* 655 S.W.2d 70, 74[6, 7] (Mo.App.1983); *Odum v. Cejas,* 510 S.W.2d at 222[2, 3]. Here, the plaintiff's theory was as submitted in her Instruction No. 8—that the defendant was negligent in failing to hospitalize the plaintiff on March 1, 1978, and in failing to culture the infecting agent, perform sensitivity studies, take x-rays and administer intravenous antibiotics. A determination whether the defendant was negligent on March 1, 1979, depended on what he failed to do on that date and not upon his subsequent treatment of the plaintiff. The trial court did not err in the respect assigned.

### B

■ Upon the issue of causation, Dr. Conrad was asked to assume the entire course of plaintiff's treatment from the time she fell in February 1979 to and including July 1984. The doctor was then asked his opinion whether the result would have been different had the defendant exercised that degree of skill and learning ordinarily exercised by members of the medical profession in the same or similar circumstances. The substance of counsel's objection was that the question did not include all the pertinent facts. Where an objection is made to a hypothetical question on the ground that it omits facts shown in

evidence, counsel objecting has a duty to point out what matters are omitted from the question. If the objection lacks this specificity, it is insufficient to present and preserve error. *Blair v. Associated Wholesale Grocers, Inc.*, 593 S.W.2d 650, 654–55[7] (Mo.App.1980); *Denney v. Spot Martin, Inc.*, 328 S.W.2d 399, 402[2] (Mo. App.1959). Such is the case here. Likewise, the hypothetical questions put to Dr. Rehm *concerning causation* were asked without contemporaneous objection. The same rule applies. The sufficiency of the factual hypothesis is not before us on this appeal. *Byrd v. Brown*, 641 S.W.2d at 175[11, 12]; *Chambers v. Bunker*, 598 S.W.2d at 206[1].

## III

### *Instructional Error*

#### A

### *Deviation from MAI*

■ In his third point defendant maintains that the trial court erred in giving verdict-directing Instructions No. 8 and 12. Instruction No. 8, which directed a verdict for Mary, read as follows:

"Your verdict must be for the plaintiff Mary Jines if you believe:

First, defendant failed to hospitalize Mary Jines on March 1, 1979 and failed to perform culture and sensitivity studies and X-rays on that date and failed to treat her with large doses of intravenous antibiotics on that date and

Second, defendant was thereby negligent, and

Third, such negligence directly caused *or directly contributed to cause* damage to plaintiff Mary Jines." (Our emphasis.)

Instruction No. 12 is identical with Instruction No. 8, except that Instruction No. 12 directs a verdict for plaintiff Joe Jines, Mary's husband. It is obvious that Instructions 8 and 12 were rescripts of the standard malpractice verdict-director—MAI 21.01—but the third paragraph of each verdict-director was modified by using the first option of MAI 19.01. The version of MAI 19.01 in use at the time of trial was

denominated "Verdict-Directing Modification—Joint Tort Feasors," and the purpose of the first optional paragraph, which was used here, was explained thus:

"When the verdict directing instruction directs a verdict against one of two or more joint tort-feasors, the 'direct result' language of paragraph Third of verdict directing instructions such as 17.01 and 17.02 might be misleading. In such cases plaintiff, at his option, may substitute one of the following:

Third, such negligence directly caused or contributed to cause damage to plaintiff...."

*See* MAI 19.01 [1981 Revision]. Clearly, MAI 19.01 was meant to be used when there are joint tort feasors. *See Honey v. Barnes Hospital*, 708 S.W.2d 686, 692[2] (Mo.App.1986). The question with respect to the form of Instructions No. 8 and 12, however, is whether, in the circumstances, defendant can now be heard to say that those instructions were prejudicially erroneous. The defendant now objects, as we understand him, that inclusion of the phrase "or directly contributed to cause" in paragraph "third" of Instructions 8 and 12 diminishes the plaintiffs' burden to show that defendant's negligence was the direct and proximate cause of the plaintiff's injury and therefore misdirected the jury. There are precedents which *suggest* that the use of such language weakens the element of causation required to be found. *See Joly v. Wippler*, 449 S.W.2d 565, 569[4] (Mo.1970); *Waldrip v. American Buslines, Inc.*, 327 S.W.2d 211, 217 (Mo.1959). There are other, pre-MAI cases which positively hold that use of the phrase "caused or contributed to cause" to hypothesize a finding of causation is erroneous, but not prejudicial. *Brooks v. Mock*, 330 S.W.2d 759, 767–68 (Mo.1959). Considering these precedents, we cannot say abstractly and as a matter of law that the inclusion of the phrase "or directly contributed to cause" positively misdirected the jury on the issue of causation.

Moreover, the specific objection now made was not raised at either of the two instruction conferences. At the first of

these two conferences, counsel for defendant objected only that "the record does not contain sufficient evidence to make a submissible case because it fails to prove that the damage and injury to plaintiff was a direct result directly contributed to by acts or omissions of the Defendant Doctor." Before the second instruction conference, Instructions No. 8 and 12 were revised. Defendant's counsel asked the trial court to "please show the same objections made to this particular revised instruction as made to the original verdict-directing Instructions 8 and 12."

■■■■ Deviation from MAI is no longer necessarily prejudicial. Failure to raise a particular deviation by contemporaneous objection is to be considered in determining whether deviation is prejudicial, and if a defect is not readily apparent to counsel preparing to argue the case, it is unlikely the jury will be confused or misled. *Cornell v. Texaco, Inc.*, 712 S.W.2d 680, 682 (Mo. banc 1986); *Hudson v. Carr*, 668 S.W.2d 68, 71–72 (Mo. banc 1984). The finding of causation hypothesized in Instructions 8 and 12 was not apparent to experienced counsel at either of the two instruction conferences. We cannot say the challenged instruction misdirected, misled or confused the jury.

## B

### Sufficiency of Instructional Hypothesis of Facts

Finally, the defendant objects that Instructions 8 and 12 were prejudicially erroneous because they do not require a finding "as to whether ... an infection of the bone fracture existed on March 1, 1979, which then required the treatment required in paragraph first." As developed in the "argument" part of his brief, defendant's objection is that the " 'ultimate fact' which the jury should have been required to find was whether there was such an infection

on March 1 and that such infection required certain actions."

■■■■ We find this objection strained and tenuous. A party is entitled to submit his cause on his own theory of the cause, and in submitting that theory he is entitled to the benefit of the evidence not fundamentally contrary to his submitted theory. *Welch v. Sheley*, 443 S.W.2d 110, 118[6] (Mo.1969); *Miller v. Riss & Co.*, 259 S.W.2d 366, 370–71[2, 3][4] (Mo.1953); *Robertson v. Grotheer*, 521 S.W.2d 452, 457 (Mo.App. 1975). In this case, the plaintiffs' theory, as we have noted, was that Mary developed a wound infection in and around the surgical incision made by the defendant when he originally reduced the fracture, and that the defendant negligently failed to administer treatment which would have prevented the development of osteomyelitis, or bone infection, which required removal of one of the bones in her forearm.

Paragraph First of both verdict-directing instructions hypothesizes that:

"[D]efendant failed to hospitalize Mary Jines on March 1, 1979 and failed to perform culture and sensitivity studies and X-rays on that date and failed to treat her with large doses of intravenous antibiotics on that date...."

■■■ The factual hypothesis submitted practically tracks Dr. Conrad's description of the treatment which should have been administered. As for the assertion that the existence of an infection should have been hypothesized, the rule is that only issues of fact which are genuinely in dispute need be submitted to a jury. *Johnson v. Pacific Intermountain Express Co.*, 662 S.W.2d 237 (Mo. banc 1983), *cert. denied*, 466 U.S. 973, 104 S.Ct. 2349, 80 L.Ed.2d 822 (1984). In his pretrial deposition, the defendant conceded that an infection had developed on March 1, 1979.[3] Inasmuch as there was no genuine dispute as to the existence of infection on March 1, 1979, failure to hy-

---

3. "Q. Rather than coming in mid-March she came to see you then about the 1st of March.
A. Yes, sir.
Q. With complaints of pus and discharge from the wound.

A. That is correct.
Q. What is the significance of the presence of pus and drainage from a surgical incision, Doctor?
A. She obviously had infection."

pothesize and require a finding of that fact was not error.

We find no error materially affecting the merits of the action in any respect briefed or argued in this court. Accordingly, the judgment is affirmed.

PREWITT, P.J., and FLANIGAN and MAUS, JJ., concur.