804 F.Supp. 1147 (1992)
Bruce SHELTON, Plaintiff,
v.
UNITED STATES of America, Defendant.
No. 91-1639C(5).
United States District Court, E.D. Missouri, E.D.
October 16, 1992.
*1148 Robert J. Albair, St. Louis, Mo., for plaintiff.
Eric Tolen, Asst. U.S. Atty., St. Louis, Mo., for U.S.

MEMORANDUM OPINION
LIMBAUGH, District Judge.
Plaintiff has filed this complaint against the United States of America pursuant to the Federal Torts Claim Act, 28 U.S.C. § 1346(b), 2671 et seq. Plaintiff alleges that he was negligently diagnosed and *1149 treated for a human bite wound on the middle finger of his right hand. Plaintiff asserts that the emergency room doctor at the John Cochran Veterans' Hospital (hereinafter referred to as the V.A. Hospital) failed to properly diagnose and treat his injured finger for a human bite; that the medical staff, in general, failed to properly instruct him as to wound care upon discharge; and that as a result of their alleged negligence, he developed a gangrene infection and a portion of his finger had to be amputated. The case was tried before the Court, sitting without a jury, on May 11, 12, and 20, 1992. All objections to exhibits that were taken with the case, are now overruled, and all exhibits offered into evidence at trial are now received into evidence. This Court, having now considered the pleadings, the testimony of the witnesses, the depositions testimony, the documents in evidence and any stipulation of the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52.

FINDINGS OF FACT
Plaintiff Bruce Shelton is a citizen of the United States who resides within the Eastern Division for the Eastern District of Missouri. Jurisdiction of this Court is asserted pursuant to the Federal Torts Claim Act, 28 U.S.C. § 1346(b), 2671 et seq.
On December 29, 1989 plaintiff, a 41-year old black male, made arrangements to meet his ex-wife for dinner. For reasons unknown, plaintiff decided to pass the time waiting for his wife at a tavern near his home. While at the bar, he had two or three drinks.
At some point during the evening, he struck up a conversation with an unknown woman. Upon leaving the tavern alone, he encountered this woman on the street. Some type of altercation ensued in which plaintiff suffered an injury to the last phalanx or tip of the middle finger of his right hand. The finger was bleeding and painful. He walked the five or six blocks to his home and called 911 for emergency help. He told the 911 dispatcher that he had been shot.
The ambulance, in response to his 911 call, transported plaintiff to John Cochran Veterans' Hospital. The ambulance trip sheet indicates that plaintiff made contradictory statements regarding the nature of his injury, i.e. he stated that he had been shot and that he had been bitten. He would not allow the paramedics to examine his finger.
Upon arrival at the emergency room (also commonly referred to as "E.R.") at approximately 10:30 pm. plaintiff was first seen by the admitting nurse, Marianne Flesch. She signed the ambulance trip sheet and took a brief admitting history from Shelton. Plaintiff claims that he told a black admitting nurse and the doctor on duty that he had been bitten. Nurse Flesch, a white woman, noted on the admission form only that plaintiff had suffered a "trauma" to his right middle finger.
Shortly thereafter plaintiff was examined by the staff doctor in the E.R. that evening, Dr. Mary Beth Cishek. Dr. Cishek was a second year resident in internal medicine. She had been working at John Cochran since Spring 1989 and had rotated into the E.R. approximately one month before the incident of December 29, 1989. As a medical student and during her residency-training, she had seen and treated patients with gunshot wounds and bites, including human bites.
When she first saw the plaintiff, he was sitting upright on a stretcher. She asked him what happened to his right hand. He said he had been "bitten". She asked him a number of times how he was bitten and by whom. He did not answer her. Dr. Cishek noted on his chart that he smelled strongly of alcohol. However, he appeared to be coherent and understand her questions.
Finally, plaintiff said that he might have been shot. Once again she asked him how he was shot and by whom. Again, plaintiff did not answer.
She next examined plaintiff's hand, explored his wound and irrigated it with sterile water. She looked at the wound, i.e. laceration, on both sides and at the base of *1150 the nail. The injury actually consisted of two wounds: one wound was on the distal phalanx and the other on the middle phalanx. The wound on the middle phalanx was on the under side of the finger (palmer side) and the wound on the distal phalanx was on the top of the finger next to the back portion of the nail. The palmer side laceration was a jagged cut five (5) cm. (almost 2 inches) long, ending two (2) cm. before the tip. There was good capillary refill sensation and the finger was "intact to pinprick", indicating no damage to the nerves. She found no puncture or teeth marks. There was no bone visibly protruding through the skin. She did not debride the lacerations.
She sent plaintiff to x-ray. The x-ray showed a fracture at the base of the distal phalanx, i.e. the outer bone of the finger. Specifically, the x-ray report showed "a non-displaced fracture of the distal phalanx of the middle finger. The articular surfaces are not involved and no dislocations are seen." The x-ray report makes no reference to an "open fracture". Dr. Cishek reexamined plaintiff's finger and concluded that he did not have an "open fracture". However, she was uncertain as to whether the fracture was related to the injury suffered that evening. She again questioned plaintiff as to the origin of the injury and again he was unresponsive. She then consulted with the plastic surgeon on call that evening. She informed the plastic surgeon of the conflicting history given by the plaintiff, the information contained in the x-ray report, and of her own observations of the wounds. She told him that her diagnosis was "laceration of the finger caused by a gunshot wound". The plastic surgeon advised use of an aluminum splint and a follow-up consultation with plastic surgery in a few weeks.
Since she considered the wound to be a "clean" gunshot wound, she determined that it was unnecessary to prescribe antibiotics. Plaintiff had indicated to her that he had had a tetanus shot recently so she did not give another one. Dr. Cishek did not have access to plaintiff's medical records from prior visits to the E.R. or hospitalization at the V.A. Hospital.
Dr. Cishek instructed plaintiff on his care following discharge from the E.R. He was told to apply ice to his finger for the first twenty-four (24) hours, then to keep the finger clean and dry. She told him to check his finger and return to the E.R. immediately if he had drainage or swelling. She did not specifically tell him to remove the bandage and splint in order to check the finger. She further instructed him to return to the V.A. Hospital in approximately four weeks for a plastic surgery consultation. She then departed leaving plaintiff to be attended to by an E.R. nurse.
Nurse Carol Teague, a black woman, was on duty that evening assisting in the E.R. Upon Dr. Cishek's instructions, she cleansed and dressed the finger. His dressing included an application of a topical antibiotic ointment, Neosporin. Nurse Teague does not recall plaintiff saying anything to her about the wound being the result of a human bite; however, she does recall overhearing plaintiff (while he was waiting to see Dr. Cishek) tell an unknown person (possibly a woman) that he had been bitten by a woman. Nurse Teague was at her desk, approximately ten (10) feet from plaintiff and partially blocked by wall barricades when she heard plaintiff relay this information to someone. She could not see who it was nor did she hear a response from that person. Her cleansing of the injury also did not include debriding it.
While bandaging and splintering his finger, Nurse Teague went over some written instructions with the plaintiff. She reiterated the icing of his finger for the first 24 hours, then to keep it dry. She emphasized that plaintiff should return immediately to the E.R. if he experienced increased pain, increased swelling, discoloration of the finger, or observed any foul-smelling discharge from the finger. Although Dr. Cishek had indicated to the plaintiff that he need not return (absent the previously mentioned change in condition) for four weeks, Nurse Teague told plaintiff to return to the E.R. in about two weeks so that his finger could be reexamined. Nothing was said about plaintiff removing the bandage and *1151 splint in order to check for signs of infections.
Upon discharge, plaintiff was given written instructions for his medical care. The exact circumstances of his discharge are a bit unclear. However, it appears that Nurse Teague filled out two sets of discharge papers for plaintiff and wrote additional instructions (reiteration of her verbal instructions) on a set for the plaintiff. She did this because she believed that plaintiff had been inattentive during her earlier explanation of the care of his finger. Plaintiff balked at signing his discharge papers because he wanted some pain medication. Nurse Teague consulted with Dr. Cishek who prescribed only Tylenol. No antibiotics were given to plaintiff while he was at the E.R. nor were any prescribed for him. Plaintiff signed the papers. She gave plaintiff a copy of the set he signed, the other set were left on her desk.
When Nurse Teague finished her shift and left the E.R. a few minutes later, plaintiff was still in the E.R. waiting area. She does not know if plaintiff took with him the written instructions. Plaintiff has in his possession only a sheet entitled "Guide for Suture Removal". This document is given to all patients having lacerations, such as plaintiff, whether or not the injury is sutured. It contains general instructions for the care of such injuries. It specifically notes the need to keep the wound clean and dry; and to return to the hospital immediately if the wound shows signs of redness, swelling or foul-smelling discharge.
Plaintiff took a taxi to his niece's apartment where he was residing at the time. He went to bed where he remained for the next couple of days. He did not sleep that night because of the pain. He put ice on his hand. He barely ate or slept for the next four days because of the pain. No one came over and he did not discuss his injury with anyone. There was no testimony or evidence as to the whereabouts of his niece during this time period. Plaintiff began taking Anacin (aspirin) for his pain. The pain continued throughout New Year's Eve and New Year's Day. During the early morning hours of January 2, 1990 plaintiff noticed a foul smell coming from his finger. He took the bandage off and observed that his finger was grossly discolored.
Later that day, plaintiff walked to the V.A. Hospital. The medical records indicate that plaintiff returned to the E.R. at approximately 2:55 pm. on January 2, 1990. He told the admitting physician, Dr. Terrance Sedgewick, an orthopedic resident at the time, that he had been in a fight a few days earlier and had been struck on the finger. Plaintiff told Dr. Sedgewick that he had been drinking and could not recall exactly how he had injured his finger. Dr. Sedgewick examined plaintiff's finger. The finger was grossly discolored, swollen and full of foul-smelling purulence. Plaintiff was admitted to the hospital. A culture and x-rays were taken of the injury site. The x-ray report showed a "[n]ondisplaced fracture of the distal phalanx of the middle finger. The articular surfaces are not involved and no dislocations are seen." The pathology report later confirmed a massive streptococcus infection and gangrene. Streptococcus is a bacteria commonly found in the human mouth.
Plaintiff was prepped for irrigation and debridement of the fracture. This was performed by Dr. Glen Johnson, with assistance from Dr. Sedgewick. Dr. Johnson's medical report indicates a preoperative and postoperative diagnosis of "infected open tuft fracture of right long finger". The laceration was treated with antibiotics and packed open awaiting the culture results. The next day, a dressing change revealed widespread infection and plaintiff was prepped for amputation of the finger. Following the amputation of the middle and distal phalanx, plaintiff had numerous postoperative irrigations and debridements on the remaining finger stump due to continual infection. After the amputation, the medical records for the first time reference a diagnosis of a "bite" or a "human bite". In the nursing notes of January 3, 1990, the diagnosis references a "human bite". In the pathology report, dated January 8, 1990, reporting the results of the culture on the amputated portion of plaintiff's finger, the report references a "human bite". *1152 In Dr. Charles Sutherland's medical report of January 9, 1990, he makes note of a "bite". A physical therapy consultation report, dated January 16, 1990, references a "human bite from a fight".
In addition to the several irrigation and debridement procedures, plaintiff also received physical therapy for his hand while he was hospitalized. On January 19, 1990 plaintiff was discharged from the hospital.
A physical therapy note, dated January 16, 1990, describes the condition of Shelton's right hand as of that date. The numbness in his 2nd and 4th fingers was decreasing. He complained of slight pain in the right wrist on flexion. There was dry flaky skin around the two sutures on the palmar surface at the second metatarsal. The stump was edematous (swollen) and there was a slight bloody drainage but no obvious odor. The thumb seemed all right concerning range of motion (noted as ROM) but the four digits all had defective ROM. Strengthwise, Shelton's hand was "grossly in good range" with limitations affecting finger opposition and flexibility. There was intrinsic muscle atrophy. Sensation was intact, with respect to light touch and sharp/dull. Shelton had had six in-hospital physical therapy sessions consisting of hydrotherapy (whirlpool) and exercise. Progress was noted as good except for some concern about his wrist ROM.
Upon discharge from the V.A. Hospital, plaintiff was instructed on the use of rubber bands and putty for therapy and exercise. He returned to the hospital for follow-up care on January 25, 1990. He was to return to the hospital in three weeks for further physical therapy. Plaintiff returned twice for physical therapy sessions then stopped attending. He was discharged from physical therapy on February 12, 1990 for failure to attend scheduled sessions. He has not returned to the hospital since for physical therapy regarding his right hand.
After filing this lawsuit, plaintiff's counsel referred plaintiff to an orthopedic surgeon, Dr. James Strickland and a vocational rehabilitation consultant, James England.
Dr. Strickland is an orthopedic surgeon in practice for sixteen (16) years. He has been Board-certified as an orthopedic surgeon since 1983. He first examined plaintiff on October 24, 1990. His medical report of that visit notes that "[s]urgical scars are well-healed. There is some slight hypersensitivity to the tip of the finger over the end of the stump. The range of motion of the finger at the metacarpal phalangeal joint does show slight hyperextension of approximately 5-10 degrees and limitation of full flexion of approximately 5-10 degrees. There is no other abnormalities noted at this time." His second exam of plaintiff on April 29, 1992 (shortly before trial of this case commenced) notes that plaintiff's finger is taped and without it, the finger is uncomfortable. He further notes that plaintiff has a tingling sensation in his thumb, index and ring finger tips. Finally, Dr. Strickland notes that plaintiff is now suffering from carpal tunnel syndrome, which he points out is unrelated to the subject injury.
After the October 24, 1990 exam, Dr. Strickland referred Shelton to the Milliken Hand Rehabilitation Center at Barnes Hospital in St. Louis, Missouri. The Center's findings show that (at the time of plaintiff's evaluation) there was generalized weakness in the injured hand, persistent swelling in the finger stump, numbness throughout the hand, a burning and tingling sensation in the remaining fingertips, as well as generalized tenderness (to the touch) of the hand. The grip strength in the injured hand was greatly reduced as well as the pinch grip. The fine motor dexterity in the injured hand was less than that in plaintiff's normal left hand.
In August 1990, plaintiff was evaluated by James England, a vocational rehabilitation consultant. Mr. England has been a vocational rehabilitation counselor for nineteen (19) years; Board-certified since 1975. Although he primarily works with injured workers evaluating their disability and assisting in employment opportunities, he does not have a medical education background.
*1153 In his April 4, 1991 report of Shelton's August 1990 visit, Mr. England summarizes his interview of Shelton. This interview consisted of eliciting from Shelton information regarding Shelton's education, his past employment history, his earnings history, a brief medical history, and the status of the condition of the injured hand. His evaluation also included a review of Dr. Strickland's report, certain medical records of plaintiff, and a physician's report by Dr. John Boswick (a physician hired by plaintiff's counsel to give an opinion as to the level of care accorded plaintiff in the E.R. the night of December 29, 1989).
Mr. England's report notes that plaintiff "has a rather nasty looking scar and lack of a finger." He noted that plaintiff seemed "quite depressed" during their meeting. The report indicates that plaintiff told Mr. England that he "had good health prior to this injury other than some trouble with knee ligaments in 1973." The report does not state anything about plaintiff's prior E.R. visits in 1984 for a human bite on his left hand, a dog bite to the left thumb, and another dog bite on the left hand; in 1985 for facial lacerations from a fight; in 1988 for lacerations to his right ear from being hit on the head with a baseball bat during a fight; in 1989 for an open wound to his face and a foot abrasion, drug dependency (cocaine), and a laceration over the knuckle of the little finger of his right hand.
Plaintiff further stated to Mr. England that he had gone to the V.A. Hospital for physical therapy approximately three or four months (prior to the August interview) and had been shown range of motion exercises. The report fails to note plaintiff's discharge from physical therapy on February 12, 1990 for failure to attend scheduled sessions. He claimed to be performing these exercises on his own at home.
Plaintiff complained that being outside in the cold increased the stiffness and pain in his injured hand. He stated that the hand was tender to the touch and that vibrations or bumping the hand caused a great deal of pain. He stated that all of his fingers, including the middle finger stump, had numbness; and that most of the time his stump was swollen. He can only lift 10 to 15 lbs with his injured hand and can only grip about 7 lbs. He has difficulty climbing a ladder, driving a car, painting, and playing handball and lifting weights (activities he engaged in before the injury).
As for his work history, plaintiff, at the time of the interview, was employed by the Leaf Corporation doing light maintenance work at $5.40/hr. He stated that his prior employment included: 1) a waiter at Pasta House Co. from March 1989 to September 1989 at $10.00/hr with tips; 2) a waiter at Sam's Plank House from March 1988 to January 1989 at $10.00/hr with tips; 3) a swing manager at McDonald's from April 1987 to March 1988 at $5.00/hr; and 4) a waiter at Talayna's from 1982 to 1988 at $10.00/hr with tips. There is no reference as to the actual duties performed by plaintiff at any of these jobs nor the circumstances under which plaintiff left each of these jobs.
The report concludes with Mr. England's determination that plaintiff had to give up working as a waiter and take a lighter form of work at a 50% decrease in wages due to his injured hand. Mr. England further concluded that Shelton would never be able to work as a waiter due to the physical appearance of the hand and the limited functions of the hand. Finally, Mr. England concluded that "[I] do not see him as being capable of earning much more than he is right now with the condition of his hand as it is." The report does not analyze or review any other occupations that plaintiff may be able to engage in despite his injured hand. The report does not analyze plaintiff's education with regard to any occupation outside the food service industry. Finally, the report makes no mention of plaintiff's felony conviction on a drug charge and for 3rd-degree assault.
Plaintiff's federal tax returns and W-2 forms show earned income for the plaintiff as follows: 1991$11,449; 1990$6339; 1989$9467; 1988$5481; 1987$5649; 1986$5047; 1985$2501; 1984$3909; 1983$6195; 1982$2816; and 1981$5201. However, at trial, plaintiff's counsel *1154 conceded that these tax returns are incorrect, i.e. plaintiff has understated his actual earnings for these tax years.
At the time of his interview with Mr. England in August 1990, plaintiff was working for the Leaf Corporation as a maintenance worker. His work consisted of sweeping, mopping, removal of trash, cleaning the restrooms, cleaning the lunchroom, and cleaning the outside grounds. There was no heavy lifting required of his job. In July 1991 plaintiff was terminated from his job with Leaf Corporation for excessive tardiness. After that termination, he filled out one job application, although he claims to have made several oral inquiries about jobs. At the time of trial, he had obtained a job at a local restaurant, Culpeppers, as a cook's apprentice. He was making minimum wage and working three days per week; however he anticipated increasing his workload to five days per week.

CONCLUSIONS OF LAW
This Court presumably has jurisdiction over this matter under 28 U.S.C. § 1346(b) and the Federal Torts Claim Act, 28 U.S.C. §§ 2671 et seq. As a preliminary matter, the Government argues that this Court lacks subject jurisdiction under the FTCA because the plaintiff's claim at trial differs from the claim he presented to the Veterans' Administration.
The Court will accept into evidence the Government's post-trial exhibits A (plaintiff's administrative claim) and B (the V.A.'s denial of plaintiff's administrative claim) for the sole purpose of determining whether or not this Court has jurisdiction over this matter.
Exhaustion of administrative remedies is a jurisdictional prerequisite to suit under the FTCA. Deloria v. V.A., 927 F.2d 1009 (7th Cir.1991); G.A.F. Corp. v. United States, 818 F.2d 901 (D.C.Cir.1987); Celestine v. V.A., 746 F.2d 1360 (8th Cir. 1984); Lunsford v. United States, 570 F.2d 221 (8th Cir.1977); Melo v. United States, 505 F.2d 1026 (8th Cir.1974). The purpose of the claim presentment prerequisite is to encourage administrative consideration and settlement of the claim, thereby avoiding unnecessary protracted litigation. Deloria, at 1010-11. A jurisdictionally adequate presentment, pursuant to the FTCA, need only to provide written notice to the appropriate agency of the incident and request money damages in a sum certain. Deloria, at 1009. The claimant must describe the injury in enough detail to enable the agency to begin its own investigation. G.A.F. Corp., at 919; Preston v. United States, 624 F.Supp. 523, 524 n. 1 (E.D.Mo. 1986).
The Government argues that plaintiff presented an administrative tort claim to the V.A. based upon the allegation that the emergency staff of the V.A. Hospital had failed to properly treat a human bite wound; however, plaintiff's lawsuit is based upon an allegation that the emergency staff failed to properly diagnose an open fracture. Since the plaintiff is now alleging a failure to diagnose an open fracture, the Government contends that the V.A. was not accorded the opportunity to investigate this claim prior to the initiation of the lawsuit. Therefore, this Court lacks subject matter jurisdiction for failure to comply with § 2675(a).
The Court believes that the Government is "splitting hairs" in defining the parameters of plaintiff's claim. After reviewing the administrative claim, the agency's denial of the administrative claim, and hearing the evidence at trial, this Court finds that any variation between the administrative tort claim and the allegations raised in the lawsuit are insignificant and do not strip this Court of subject matter jurisdiction.
An administrative claim does not have to propound every possible theory of liability in order to satisfy § 2675(a). Deloria, at 1010-11; see also, Bush v. United States, 703 F.2d 491, 494 (11th Cir.1983). However, a plaintiff cannot "present one claim to the agency and then maintain suit on the basis of a different set of facts." Deloria, at 1011, citing Dundon v. United States, 559 F.Supp. 469, 476 (E.D.N.Y. 1983). The presentment requirement is "a *1155 simple requirement of notice." G.A.F. Corp., at 919.
The plaintiff's administrative claim and his allegations at trial all pertain to his medical malpractice claim that his initial injury (on December 29, 1989) was misdiagnosed and improperly treated resulting in the ultimate amputation of most of his right middle finger. Plaintiff has always maintained that the initial injury was a human bite wound, not a gunshot wound as diagnosed by Dr. Cishek. He further alleges that even if the wound's origin had been a gunshot or unknown, the wound should have been irrigated, debrided, and treated with antibiotics. It appears to this Court that the issue of an open fracture is incidental to the crux of plaintiff's claim. No one disputes that a fracture existed; however even the medical community differs as to the terminology associated with the fracture sustained by plaintiff. The x-ray report of December 29, 1989 refers to the fracture as a "non-displaced fracture"; the x-ray report of January 2, 1990 refers to the fracture as an "oblique fracture"; and finally, Dr. Glen Johnson's report of January 2, 1990 refers to the fracture as an "open tuft fracture". Since the V.A. had all of plaintiff's medical records and knew that plaintiff was claiming a misdiagnosis and improper treatment, it was always in a position to investigate the nature of the fracture and the implication of the type of fracture sustained. The set of facts set forth in plaintiff's administrative claim and the facts adduced at trial have remained constant.
For purposes of § 2675(a)'s notice requirement, the information provided by the plaintiff's presentment of his claim was wholly sufficient to apprise the Government of the nature of his medical malpractice claim. Consequently, this Court has subject matter jurisdiction over this matter pursuant to the FTCA.
Under the FTCA, this Court must follow the substantive law of the state where the injury or incident complained of occurred. Massachusetts Bonding and Ins. Co. v. United States, 352 U.S. 128, 77 S.Ct. 186, 1 L.Ed.2d 189 (1956); Holst v. United States, 755 F.Supp. 260, 264 (E.D.Mo.1991); Preston v. United States, 624 F.Supp. 523, 525 (E.D.Mo.1986). In this case, plaintiff's claim arose at the John Cochran Veterans' Hospital in St. Louis, Missouri; therefore the Court will apply the substantive law of Missouri.
Plaintiff's claim is one of medical malpractice. Plaintiff's claim is predicated upon three allegations: 1) that the healthcare staff manning the E.R. at the V.A. Hospital on the night of December 29, 1989 negligently failed to diagnose plaintiff's human bite wound with an associated "open" fracture; 2) negligently failed to treat plaintiff's injury in that they failed to provide plaintiff with surgical irrigation and debridement and appropriate antibiotics; and 3) negligently failed to properly instruct plaintiff as to wound care and follow-up at a medical facility. Plaintiff further contends that regardless of the origin of the wound, the failure to irrigate and debride the wound, plus the lack of antibiotics directly caused the gangrene infection which led to the amputation of the finger.
Under Missouri law, in order to make a prima facie case of medical malpractice, a plaintiff must establish three elements: 1) that an act or omission of the defendant failed to meet the requisite medical standard of care; 2) that the act or omission of the defendant was performed negligently; and 3) that there was a causal connection between the act or omission and the plaintiff's injury. Baker v. Gordon, et al., 759 S.W.2d 87, 91 (Mo.App. 1988); Jines v. Young, 732 S.W.2d 938, 944 (Mo.App. 1987); Wilson v. Lockwood, 711 S.W.2d 545, 550 (Mo.App.1986); Yoos v. Jewish Hospital of St. Louis, 645 S.W.2d 177, 183 (Mo.App.1982).
The current standard of care applicable to physicians and surgeons in medical malpractice cases is the degree of skill and learning ordinarily used by members of the medical profession under the same or similar circumstances. The general rule, in medical malpractice cases, is that proof of the appropriate standard of care (for the particular injury alleged) requires *1156 expert medical testimony; however, independent expert testimony is not necessary where the defendant-doctor's own testimony establishes the appropriate standard of care. Baker v. Gordon, at 91.
Both parties presented ample evidence regarding the appropriate standard of care with regard to treating a human bite wound and a gunshot wound. Plaintiff's expert witnesses, Drs. James Strickland and John Boswick[1], and Dr. Mary Beth Cishek, the treating E.R. physician, all testified that the appropriate standard of care for the treatment of a human bite wound is:
1) Irrigation of the wound;
2) Debridement[2];
3) A culture taken in order to specify the type of bacteria present, if any;
4) The administration of antibiotics; and
5) Wound packed open.
The medical experts differed, though, as to the appropriate standard of care for a gunshot wound. All agreed that the wound should be irrigated and debrided for any bullet fragments, etc. However, Dr. Cishek testified that gunshot wounds are normally "clean" wounds unless the bullet has travelled through a portion of the body where risk of contamination is high, e.g. the intestine. She stated that a clean gunshot wound does not require the administration of antibiotics. Dr. Strickland adamantly testified that gunshot wounds are "contaminated" wounds and should be treated in a similar fashion as a human bite wound. He emphasized the importance of antibiotics. Dr. Boswick testified[3] that gunshot wounds may be "clean" or "contaminated"; consequently, not every gunshot wound is treated with antibiotics.
Dr. Cishek testified that when she examined plaintiff's finger she saw two lacerations: a deep laceration on the palmer side and a superficial laceration on the dorsal side. There were no lead fragments or any other visible foreign material in the wound. Her medical report does not note any significant bleeding from the wound. The x-ray picture and the accompanying report do not show the presence of any foreign material in the wound.
There is a disagreement among the medical experts as to the presence of an open fracture[4] as of December 29, 1989. Dr. Cishek testified that her examination definitely did not reveal the presence of an open fracture and that the x-ray taken that night confirmed this fact. Plaintiff's medical experts dispute this and state that based upon their belief that plaintiff had suffered a human bite and the x-ray taken that night, plaintiff had an open fracture.
At the point where the fracture occurred, at the base of the nail, the bone is extremely close to the skin. Nonetheless, Dr. Cishek made the initial examination of the plaintiff and did not find an open fracture. The x-ray report of December 29, 1992 makes no mention of an open fracture. The first mention of an open fracture is in the medical report of Dr. Glen Johnson on January 2, 1990. At that time, plaintiff's finger was gangrenous[5], badly swollen and pustulant. It is conceivable that the gangrene had become so acute, by January 2, 1990, that enough tissue had died causing exposure or "communication" of the bone to outside of the skin. As for the plaintiff's medical experts, neither doctor saw the plaintiff at the time of his initial visit to the E.R. and both testified to the fact that the x-ray of December 29, 1990 simply confirmed *1157 what they already had decided, i.e. that plaintiff had a human bite injury with an open fracture. Furthermore, Dr. Strickland never mentioned the presence of an open fracture in the report he submitted on plaintiff's behalf during consideration of plaintiff's administrative claim. He did not view the December 29th x-ray until after his deposition was taken for this case.
Given Dr. Cishek's background and her familiarity with gunshot wounds, human bites, and open fractures, the Court finds that Dr. Cishek did not violate the appropriate standard of care in treating what she believed to be a gunshot wound.
However, the issue still remains as to the reasonableness of Dr. Cishek's belief that plaintiff had suffered a gunshot wound and consequently embarking on a course of treatment appropriate for such a diagnosis but inappropriate for the diagnosis of a human bite. The issue is whether another physician with the degree and skill ordinarily used under the circumstances of December 29, 1989 would have diagnosed a human bite wound or at least if a human bite was suspected, would have employed the indicated treatment of irrigation, debridement (and culture), and antibiotics.
Plaintiff has testified that he never told anyone at the hospital that he might have suffered a gunshot wound. He maintains that he told an unknown black woman, presumably a nurse, that he had been bitten by a woman.
The Court has carefully reviewed plaintiff's trial testimony, and trial exhibits. It is clear to this Court that plaintiff's account of what happened the night of December 29, 1989 has been inconsistent. Plaintiff admits that he told the 911 dispatcher that he had been shot. The ambulance trip sheet shows that he told the paramedics that he had been bitten and also that he had been shot. Dr. Cishek medical report shows that plaintiff again stated that he had been bitten and had been shot. Finally, Dr. Sedgewick's report shows that plaintiff told him that he had been "struck" on the finger.
Dr. Cishek attempted twice to elicit from the plaintiff the real story as to how his finger was injured. Given that she did not observe nor did the x-ray indicate any open fracture, that she did not observe any teethmarks or puncture wounds, that she did not observe any lead fragments in the wound, and that plaintiff's refusal to elaborate as to the origin of the wound is more indicative of a gunshot wound incident than a human bite incident, it was not negligent for Dr. Cishek to make a an initial diagnosis of a gunshot wound.
However, the medical testimony still indicates that when a patient presents a serious injury with conflicting stories as to the origin of the injury; and one of the possible types of injuries has a high potential for infection with serious consequences if not treated with antibiotics, then the treating physician should prescribe antibiotic therapy. Doctors Sedgewick, Strickland, and Boswick all testified that although it is better to know the type of injury in order to prescribe the most effective antibiotic, it is still recommended that an unknown serious injury should receive a general antibiotic. They also testified that the most common bacteria found in human bite wounds is streptococcus and that this is easily confirmed by a culture.
Dr. Cishek testified that there was no medical reason not to have had a culture done on Shelton's wound. She further testified that she preferred not to prescribe general antibiotics due to the possibility of an allergic reaction. However, Shelton's E.R. intake report does not indicate any known allergies to penicillin or any other antibiotic. Furthermore, Dr. Cishek never asked him whether or not he was allergic to any antibiotic. Finally, if an allergic reaction was a concern, plaintiff could have been kept in the E.R. for some additional period of time or admitted overnight for observation. Since there was some possibility of a bite wound and as it was inconclusive as to what type of bite wound (animal or human), the possibility of a serious infection should have been considered and antibiotics administered. It is Dr. Cishek's failure to administer and prescribe antibiotics which constitutes her negligence in treating plaintiff.
*1158 The fact that plaintiff developed gangrene does not in and of itself establish liability of the V.A. Hospital for medical malpractice. "In an action for malpractice based on specific negligence no presumption of negligence on the part of a physician is indulged in by the courts by reason of an adverse result from medical treatment ... and his burden also includes presentation of proof that the negligent acts caused the injury." Fisher v. Wilkinson, 382 S.W.2d 627, 630 (Mo.1964); see also, Matheus v. Lutheran Charities Ass'n, 781 S.W.2d 787 (Mo. banc. 1989). A plaintiff must be able to show a causal connection between the act or omission complained of and the plaintiff's injury. Jines v. Young, at 944-45; Delisi v. St. Luke's Episcopal-Presbyterian, 701 S.W.2d 170, 175 (Mo. App.1985). A plaintiff must present substantial evidence that his/her injury is a natural and probable consequence of the defendant's act or omission. Jines v. Young, at 945; Delisi, at 175. "If the logical conclusion from the evidence is that if certain things had been properly done certain results would not have occurred, and such results did occur, the evidence of causation is sufficient." Jines v. Young, at 945; see also, Delisi, at 175.
All the medical testimony confirmed the fact that a human bite wound is considered "contaminated" or "infected" and must be treated with antibiotics due to the large presence of streptococcus bacteria in the human mouth. The culture report of January 2, 1990 on plaintiff showed a massive streptococcus infection. The credible medical testimony indicates that the gangrene was more likely than not a result of the streptococcus infection. The credible medical testimony also indicated that the lack of antibiotics contributed to the seriousness of the infection and the resultant gangrene and amputation.
The Government relies heavily on the Delisi case for its argument that the plaintiff has failed to prove a causal connection between Dr. Cishek's failure to administer antibiotics and Shelton's wound infection. The Delisi case and the present case are easily distinguishable on the facts and evidence. The Delisi Court found that the plaintiff failed to make a submissible case on the issue of causation because he failed to present independent medical evidence that the treating doctor's failure to prophylactically administer antibiotics caused plaintiff's hand infection. Delisi, at 176. The plaintiff failed to show, by independent medical evidence, that the administration of any particular antibiotic would have been effective in controlling or preventing the infection. Id., at 176-77. In the present case, all the medical testimony agreed that antibiotics must be given in cases of human bite injuries due to the high risk of streptococcus infection. There was independent medical evidence, including testimony by defendant's witnesses, that even a gunshot wound is sometimes treated with antibiotics to prevent infection. Dr. Sedgewick, defendant's witness, testified that if either a gunshot wound or a human bite is suspected, it is safer to prescribe general antibiotics prophylactically. Finally, there was independent medical testimony to the effect that the lack of antibiotic therapy contributed to the occurrence of the strep infection in Shelton's wound. Even though defendant did not provide evidence of any particular antibiotic that should have been prescribed, he did put on evidence that Dr. Cishek could have easily cultured the wound in order to ascertain the presence and type of bacterial infection and thus would have been able to prescribe a specific antibiotic.
Missouri law applies the system of comparative negligence, apportioning damages between the parties who are at fault. Gustafson v. Benda, 661 S.W.2d 11 (Mo. banc 1983). Where there is evidence that the conduct of both parties combined or contributed to cause damage, the fact finder may compare the respective contributions toward such causation made by each party. Allison v. Sverdrup & Parcel & Associates, Inc., 738 S.W.2d 440, 451 (Mo. App.1987). Missouri has adopted the "pure" form of comparative fault. Under this system of comparative fault, a plaintiff's contributory negligence does not operate to bar recovery altogether, but does serve to reduce damages in proportion to *1159 fault. Holst v. U.S., 755 F.Supp. 260, 265 (E.D.Mo.1991); Preston v. U.S., 624 F.Supp. 523, 525 (E.D.Mo.1986).
The Government contends that even if it is found liable for plaintiff's injury, plaintiff's own negligence contributed to causing his injury. The Court agrees.
Plaintiff received both oral and written instructions as to the care of his finger. Dr. Cishek's medical report shows that she instructed him on the care of his finger, i.e. ice for 24 hours, hand elevated, return to the E.R. immediately if there are any signs of increased pain, swelling, or smelly discharge. The discharge instructions sheet, which plaintiff signed to the effect that he had received and understood the wound care instructions, clearly shows that plaintiff was instructed to keep the finger clean and dry (following the icing for 24 hours), and to return to the E.R. immediately if there were any signs of increased pain, swelling, discoloration, or smelly discharge.
Plaintiff contends that 1) no one gave him wound care instructions; and 2) no one specifically told him to remove or check under the splint and bandages for the signs of infection. Plaintiff's first contention is totally meritless. As stated before, all the credible evidence shows that plaintiff was given oral and written instructions on wound care by both Dr. Cishek and Nurse Teague. As to plaintiff's second contention, it is true that no one specifically told plaintiff to remove or check under the splint and bandages for signs of infection. However, there was no evidence that plaintiff did not understand the discharge instructions nor that due to some mental incapacity, he was unable to understand the instructions. Plaintiff had received the same or similar instructions in the past due to comparable injuries. The present instructions clearly told him to be on the lookout for certain signs of infection. Common sense would necessitate some type of inspection of the wound by plaintiff in order to assess whether there was swelling, discoloration, or a discharge.
Plaintiff did nothing for four days but take some aspirin. Despite such severe pain, that he could not sleep or eat for four days, he made no attempt to check the wound. He made no attempt, for four days, to keep the wound clean. When he did finally unwrap the wound and discovered the infection, he did not return to the E.R. immediately. Plaintiff, himself, testified that he discovered the infection during the "early hours" of the morning of January 2nd; yet he did not show up at the E.R. until 3 o'clock that afternoon.
The medical testimony indicates that given the amount of pain that plaintiff has indicated he was suffering the remainder of the night of December 29th and December 30th, he should have returned to the E.R. The medical testimony also indicates that given the severity of the infection on January 2, 1990, if plaintiff had checked the wound earlier, he would have discovered the first signs of infection at which point he should have returned to the hospital. The doctors agreed that earlier detection of the infection would have in all likelihood minimized the gangrene infection. The doctors also agreed that keeping the wound clean would have also minimized the onset of the gangrene infection. This Court finds that plaintiff substantially contributed to his injury by failing to take care of his wound as instructed and thereby significantly increasing the risk of infection which ultimately resulted in the need for amputation of his finger.
Accordingly, the Court finds the defendant was 50% at fault and the plaintiff was 50% at fault.
As to plaintiff's damages, the Court places little credible weight on the report and testimony of James England. Plaintiff admits that he failed to provide Mr. England (and the IRS) with correct wage earnings. At the time of the malpractice incident, plaintiff had been unemployed for several months. At the time of trial, plaintiff was employed. Plaintiff's past employment history has been checkered by terminations due to his own misconduct. He is a convicted felon automatically making it difficult for him to find employment. Plaintiff admits that following the amputation, he made little constructive effort to find a job, especially as a *1160 waiter. The one job he had, in between the amputation and filing suit, he lost due to excessive absenteeism and tardiness. Furthermore, plaintiff's own tax records (albeit incorrect due to understatement of actual earnings) show that he earned more money in the years after the amputation than he did for the years just preceding the amputation.
As for Mr. England's report regarding the future prospect of plaintiff's earning potential, the Court finds it significantly lacking in objective evaluation as to plaintiff's employment potential. The report totally focuses upon plaintiff's employment as a waiter. There is no effort whatsoever to ascertain what plaintiff's prospects are outside the "food service industry". There is no evaluation as to the contribution of education or vocational training on plaintiff's future employment possibilities.
Finally, the credible medical testimony and physical therapy reports clearly indicate that consistent physical therapy would have significantly improved the strength, flexibility, and manual dexterity of plaintiff's right hand. Plaintiff chose not to continue his physical therapy sessions as prescribed by the V.A. Hospital. His decision not to engage in physical therapy negatively impacted upon the positive recovery of functions in his right hand.
As to plaintiff's damages, the only credible evidence this Court finds is in regards to plaintiff's pain and suffering and his embarassment as to the disfigurement of his right hand. The disfigurement is permanent and even if he had engaged in regular physical therapy sessions, he still would never regain full functioning of his hand.
Accordingly, this Court finds damages of $20,000.00 for the pain and suffering, permanent disfigurement and impairment of plaintiff's right hand. After reducing these damages to account for plaintiff's fault, this Court finds for the plaintiff in the amount of $10,000.00.
NOTES
[1] Dr. James Strickland, a Board-certified orthopedic surgeon for over 15 years, and Dr. John Boswick, an orthopedic surgeon specializing in hand injuries.
[2] Debridement is a surgical procedure wherein the wound area is explored, dead tissue removed, and any foreign materials removed from the wound.
[3] Dr. Boswick's testimony is strictly by deposition.
[4] An "open fracture" is a fracture occurring to a bone that communicates to the outside usually by the bone protruding through the skin or by causing a wound to the skin and the tissue below such that the skin comes in contact with the bone.
[5] Gangrene is the lack of blood supply or other injury that causes tissue to die. It is usually accompanied by a virulent infection.